Justice Ingrid Gustafson delivered the Opinion of the Court.
***20 ¶1 Appellant Charles Geoffrey Santoro (Santoro) appeals from the jury verdict finding him guilty of negligent homicide and subsequent written judgment entered by the Ninth Judicial District Court, Toole ***21 County, thereon on June 6, 2017. We reverse and remand for a new trial.
¶2 We restate the issues on appeal as follows:
1. Whether Santoro's trial counsel provided ineffective assistance of counsel by failing to serve a subpoena upon or otherwise preserve the testimony of a crucial defense witness for trial.
2. Whether the District Court erred in failing to deduct funds paid by Santoro's insurance to Justin Gallup and Tiffany Rowell from their restitution awards.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 Santoro was charged with negligent homicide and two counts of felony criminal endangerment in connection with an incident occurring outside the VFW bar in Sunburst on August 18, 2013. At conclusion of his jury trial in August 2016, Santoro was convicted of all three offenses. On June 6, 2017, the District Court issued its written judgment in which it sentenced Santoro to 20 years MSP, 5 suspended on the negligent homicide offense and 10 years MSP, 5 suspended on each criminal endangerment offense. The District Court ran the criminal endangerment sentences concurrent with each other but consecutive to the negligent homicide sentence. The District Court also imposed restitution in the amount of $917,428.37-comprised of $57,640 to Justin Gallup (Gallup) and $859,788.37 to Tiffany Rowell (Tiffany). Santoro appeals only the negligent homicide conviction, and also asserts the District Court erred by failing to deduct the $50,000 paid by his insurance-$25,000 to each Gallup and Tiffany-from each's restitution award.
¶4 On August 18, 2013, Santoro and Richard Potter went to the VFW bar in Sunburst. While there he encountered Levi Rowell (Rowell), Levi's wife Tiffany, and Levi's friend Gallup. Santoro and Rowell knew each other as Santoro previously worked for Rowell for a brief time and they are neighbors-they lived across the road from one another. Santoro and Rowell had a couple drinks together and participated in the good-natured banter of those in the bar. Santoro's participation became crude and he was asked to leave the establishment. When he and Potter left, he commented something to the effect that none of the other patrons in the bar were veterans to which Rowell responded that neither was Santoro. This offended Santoro such that as he went to his truck, he slammed a beer bottle on the walkway.
¶5 Rowell, hearing the bottle smashing outside, became convinced Santoro had done something to Rowell's vehicle. He got up to follow Santoro, but his wife and Gallup precluded him from leaving by ***22 blocking the door. When Tiffany thought sufficient time had passed for Santoro to leave, she permitted Rowell to go outside and she and Gallup followed. When they got outside, Tiffany realized Santoro had not yet driven away but *1144 remained parked next to their vehicle. Santoro was sitting in the driver's seat, Potter was in the passenger seat, and the vehicle was running. Rowell, with Tiffany and Gallup trailing approached Santoro's vehicle-Santoro's driver's door was either open or Rowell opened it-and Santoro and Rowell began yelling at each other. Santoro asserts Rowell then grabbed him by the neck and began choking him. Santoro asserts he was starting to lose consciousness and as he could not drive forward because the bar was in front of his truck, he gassed the truck in reverse. The reversing truck's open door caught Rowell as well as Tiffany and Gallup. Rowell was dragged and pulled under the truck and Tiffany and Gallup were cast outward from the door. Santoro felt a bump as he reversed and turned the steering wheel to the right and then put the truck in forward gear and turned to the left and sped away.
¶6 Santoro consistently maintained a justifiable use of force defense, asserting his response of swiftly reversing was justified to get away from Rowell choking him. The State's theory of prosecution at trial was that Santoro drove over Rowell two times-once while reversing and again while going forward. The State did not present any testimony of investigating law enforcement officers or an accident reconstructionist in support of its theory, but instead relied on pictures taken of the scene and the testimony of Rowell's family and friends who were present during the incident. At trial, these witnesses-Tiffany, Billy Jean Scarbrough, and Sandra Owens-testified to Santoro running Rowell over both while backing up and again while going forward. Each, however, either admitted this to be inconsistent with what they related to law enforcement immediately after the incident or admitted on cross-examination that they really had not seen Rowell hit when Santoro drove forward.
¶7 On closing, the State argued extensively in promotion of its theory that regardless of whether Santoro was justified gassing his truck in reverse to get away from Rowell, he was not justified in then putting it in gear and driving over Rowell a second time:
• "Levi was dragged and then run over. As Sandy Owens said, she saw the defendant run Levi over in reverse and then run him over going forward. He never hesitated. He just boom and went forward."
• "Tiffany, as she was coming to her feet, looked out and saw Levi about 12 feet in front of the defendant in the headlights, and she ***23 said he put it in forward and gunned it forward and ran over Levi."
• "Jeah Scarbrough saw the pickup run over Levi as the defendant drove forward."
• "He peeled out in reverse and forward, never once slowed down. He used lethal, deadly force against all three."
• Defense claim of photos showing where Santoro's vehicle went don't match "eyewitnesses' reports."
• "The testimonial evidence and the physical evidence show he ran Levi over going backward and forward. But the defendant insinuates, No, you shouldn't trust the eyewitnesses."
• "Whatever excuse he's given for going backward, he's got no reasonable or rational explanation for why he went forward at all. Why is that? Because there isn't one."
¶8 Trooper Christopher Garza (Garza), then with the Montana Highway Patrol, responded to the scene shortly after the incident. Garza was the law enforcement individual responsible for investigation of the scene and reconstruction of the accident. Garza marked tire tracks as well as the location of items of physical evidence, took measurements, and prepared an accident reconstruction report. The ultimate findings of this report appear to be inconsistent with the State's theory of prosecution-based on the physical evidence of the scene, the report indicates that Rowell had been dragged under Santoro's truck while it was traveling in reverse and does not indicate that Rowell had been run over a second time when Santoro pulled forward. Needless to say, the State did not call Garza as a witness.
¶9 During its case-in-chief, Santoro's trial counsel, Max Battle, attempted unsuccessfully to admit Garza's accident reconstruction report through Sergeant Kukowski, asserting *1145 this to be appropriate as Garza was no longer a Montana Highway Patrolman, he had moved out of Montana, and counsel had only located him the evening before.[1] Trial counsel asserted that Garza was an unavailable witness such that his report could be entered as an exception to the hearsay rule. During argument on the State's objection, it is abundantly clear that trial counsel recognized Garza to be an important material witness with relevant, direct evidence refuting the State's theory of prosecution and refuting the accounts of the witnesses presented by the State. From the argument, it is clear trial counsel did nothing on a pretrial ***24 basis to preserve Garza's testimony. Trial counsel indicated he obtained a subpoena for Garza approximately two weeks before trial, but when he tried to serve it, he was told Garza was in Washington. Trial counsel represented to the District Court that he did not then have an address or any contact information for Garza, he had his investigator searching for Garza since, and they had finally located him the prior evening. Trial counsel spoke with Garza who related that he was not willing to appear for trial in person or by telephone. In response, the State indicated it has had Garza's contact information since he left Montana and trial counsel failed to ever contact the State to obtain this information. The State argued Garza was at the very same telephone number he had always had and that he was very easy to find.
¶10 Post-trial, Santoro unsuccessfully filed a motion for a new trial alleging, among other bases, that the State should have been required to call Garza as a witness as the results of his investigation contained exculpatory evidence.
STANDARD OF REVIEW
¶11 Claims of ineffective assistance of counsel are mixed questions of law and fact that we review de novo. State v. Jefferson , 2003 MT 90, ¶ 42, 315 Mont. 146, 69 P.3d 641.
¶12 We review a district court's imposition of sentence for legality. State v. Herman , 2008 MT 187, ¶ 11, 343 Mont. 494, 188 P.3d 978.
DISCUSSION
¶13 1. Whether Santoro's trial counsel provided ineffective assistance of counsel by failing to serve a subpoena upon or otherwise preserve the testimony of a crucial defense witness for trial.
¶14 Article II, Section 24 of the Montana Constitution and the Sixth Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment, guarantee a defendant the right to effective assistance of counsel. State v. Kougl , 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095.
¶15 In assessing ineffective assistance of counsel (IAC) claims, we apply the two-pronged test set forth in Strickland v. Washington , 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). Kougl , ¶ 11. Under the Strickland test, the defendant must (1) demonstrate that "counsel's performance was deficient or fell below an objective standard of reasonableness" and (2) "establish prejudice by demonstrating that there was a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." Kougl , ¶ 11 (quoting ***25 State v. Turnsplenty , 2003 MT 159, ¶ 14, 316 Mont. 275, 70 P.3d 1234 ). Courts determine deficient performance based on whether a defendant's counsel acted within the broad "range of competence demanded of attorneys in criminal cases." Schaff v. State , 2003 MT 187, ¶ 18, 316 Mont. 453, 73 P.3d 806 (citation omitted). A strong presumption exists that counsel's conduct falls within the wide range of reasonable professional conduct. Kougl , ¶ 11.
¶16 When defendants raise ineffective assistance of counsel claims on direct appeal, we first determine whether the claims are more appropriately addressed in a postconviction relief proceeding. Kougl , ¶ 14. "[A] record which is silent about the reasons for the attorney's actions or omissions seldom provides sufficient evidence to rebut" the strong presumption counsel's conduct falls within the wide range of reasonable professional conduct.
*1146 State v. Sartain , 2010 MT 213, ¶ 30, 357 Mont. 483, 241 P.3d 1032. If we cannot answer from the record "the question 'why' counsel did or did not take the actions constituting the alleged ineffective assistance, the claims are better raised by a petition for post-conviction relief where the record can be more fully developed, unless 'no plausible justification' exists for the defense counsel's actions or omissions." Sartain , ¶ 30 (quoting Kougl , ¶¶ 14-15 (internal citation omitted)). Trial counsel is afforded considerable latitude, and Santoro "must overcome the presumption that, under the circumstances," counsel's decision could be considered a sound strategy. Strickland , 466 U.S. at 689, 104 S. Ct. at 2065.
¶17 Santoro argues his trial counsel was ineffective because there was no justifiable reason to not subpoena Garza sufficiently in advance of trial to assure his attendance. Counsel clearly recognized Garza's importance in that he was the individual working for the State charged with investigating the scene and reaching conclusions based on the physical evidence. His findings directly controverted the State's theory of prosecution that Santoro drove over Rowell twice-once when backing away and again by pulling forward.
¶18 The State counters that this is not a record-based appeal and is better left to a petition for postconviction relief. The State further argues that Santoro cannot establish how Garza's testimony would have resulted in an acquittal as it is undisputed Santoro ran over Rowell and that once he asserted justifiable use of force the State did not have to prove Santoro purposely drove forward over Rowell.[2]
***26 Finally, the State asserts that Garza would likely, in essence, disregard his physical findings and the conclusions of his investigation and instead-when faced with the multiple witnesses' consistent recollection of seeing Santoro drive forward and over Rowell and the pervasive injuries suffered by Rowell-testify that there was, at the very least, a possibility that Santoro ran over Rowell twice.
¶19 There is ample evidence in the record to demonstrate trial counsel's ineffective assistance of counsel as it relates to securing Garza as a witness. He clearly recognized Garza was a material, crucial witness with evidence directly contesting the State's trial theory. Counsel attempted to subpoena Garza but his efforts at doing so were untimely and ineffective. Believing Garza's whereabouts unknown, trial counsel failed to ask the State if it had contact information for him. Recognizing the importance of Garza's evidence, trial counsel tried to correct his ineffectiveness. When he was not able to secure Garza's appearance at trial, trial counsel unsuccessfully attempted to at least enter Garza's report through another officer. Post-trial, trial counsel unsuccessfully sought a new trial arguing the importance of Garza's evidence and the need for him to appear in order for Santoro to have a fair trial. The record sufficiently supports the lack of any tactical or strategic reason or plausible justification for defense counsel's failure to secure Garza's presence at trial or otherwise preserve his testimony for trial.
¶20 In order for Santoro to succeed on direct appeal, he must rebut the strong presumption that counsel's conduct in failing to secure Garza as a trial witness or otherwise preserve Garza's testimony for trial falls within the wide range of reasonable professional conduct. Sartain , ¶ 30. The State asserts this "Court need not determine whether [trial counsel's] performance was deficient since Santoro has failed to demonstrate how the result of the proceedings would have been different had [counsel] successfully subpoenaed Trooper Garza." We do not agree. While selection of witnesses is usually within the discretion of trial counsel, under the particular situation herein-trial counsel recognized Garza was a material witness whose evidence contradicted the State's theory of the case and his failure to secure him as a witness was not planned or intentional-we cannot conclude trial counsel's failure to secure *1147 Garza as a trial witness or otherwise preserve Garza's testimony fell within the wide range of reasonable professional ***27 conduct. Trial counsel's failure to secure Garza as a trial witness or otherwise preserve Garza's testimony for trial constituted deficient performance and fell below an objective standard of reasonable conduct.
¶21 The second prong of the Strickland test requires Santoro show prejudice from counsel's deficient performance. It is clear from the record before us that, if presented with Garza's investigation and conclusion that Rowell was struck and killed while Santoro was driving in reverse, such would lend support to the defense Santoro presented at trial, while discounting the State's trial theory. As such, Santoro has demonstrated "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Kougl , ¶ 11 (quoting Turnsplenty , ¶ 14 ). Trial counsel's deficient performance prejudiced Santoro such that it is appropriate to vacate his negligent homicide conviction and remand to the District Court for a new trial thereon.[3]
¶22 2. Whether the District Court erred in failing to deduct funds paid by Santoro's insurance to Justin Gallup and Tiffany Rowell from their restitution awards.
¶23 The law entitles injured parties at a criminal sentencing hearing to restitution for "pecuniary loss," but pecuniary loss is defined to include only those "special damages ... that a person could recover against the offender in a civil action[.]" Section 46-18-243(1)(a), MCA. Restitution is a civil remedy, not a criminal punishment, which may not be ordered for damages not recoverable in a civil action. State v. McClelland , 2015 MT 281, ¶ 10, 381 Mont. 164, 357 P.3d 906. Criminal restitution permits parties injured by a criminal offense to use the criminal justice system to obtain the relief that would be available to them by filing a civil action, but without having to file a civil action. State v. Jent , 2013 MT 93, ¶ 12, 369 Mont. 468, 299 P.3d 332.
¶24 It is not disputed that Santoro's insurance paid $25,000 to each Justin Gallup and Tiffany Rowell. Santoro asserts that the District Court erred by not deducting these payments from the restitution awarded to them. The State argues that "there is no [statutory] provision requiring deduction of any such [insurance] reimbursement ***28 from the amount the offender must be ordered to pay." State v. Fenner , 2014 MT 131, ¶ 12, 375 Mont. 131, 325 P.3d 691.
¶25 Fenner is distinguishable from the situation here. Fenner assaulted a fellow motorist, Martin, who he believed had cut him off. As a result of the injuries caused by Fenner, Martin suffered medical and dental expenses which Fenner was ordered to pay as restitution to Martin. Martin's insurer paid for some portion of these expenses. Fenner argued his restitution to Martin should have been reduced by the amount paid by Martin's insurer. In affirming the district court, this Court concluded a defendant "is not entitled to benefit from an offset based on the insurance pay-out of his victim." Fenner , ¶ 10. We reasoned the "fact that [the injured party] had insured himself for medical expenses was due to good fortune and foresight; it should not benefit his attacker rather than himself or his insurance company." Fenner , ¶ 12. A defendant accordingly should "not benefit from an offset based on the insurance of the injured party." Fenner , ¶ 12.
¶26 Here, Santoro, not Gallup or Tiffany, paid insurance premiums for insurance coverage to be paid in the event Santoro injured someone while operating his motor vehicle. The insurance payouts came from Santoro's insurance and were paid on Santoro's behalf. In Fenner , the insurance payouts were from the victim's insurance for which the victim, not the defendant, paid insurance premiums. Where insurance payouts are derived from *1148 the offender's insurance, they should properly be deducted from any restitution award ordered against the offender. Failure to do so would provide double recovery constituting an unjust enrichment to the injured party. See Schuff v. A.T. Klemens & Son , 2000 MT 357, ¶ 89, 303 Mont. 274, 16 P.3d 1002. It is therefore, appropriate to remand to the District Court to properly deduct these insurance payments from the restitution award to Gallup and from any ultimate restitution award to Tiffany.
CONCLUSION
¶27 Based on the foregoing discussion we conclude Santoro's trial counsel rendered ineffective assistance of counsel by failing to serve a subpoena upon or otherwise preserve the testimony of former Trooper Garza for trial. The $25,000 insurance payouts paid to Gallup and Tiffany from Santoro's insurance shall be credited against the restitution award to Gallup and from any ultimate restitution award to Tiffany.
¶28 Reversed and remanded for a new trial.
We concur:
LAURIE McKINNON, J.
BETH BAKER, J.
DIRK M. SANDEFUR, J.
JAMES JEREMIAH SHEA, J.

The State objected to the report as hearsay and the District Court sustained the objection.

This argument is contrary to the State's trial theory where the State recognized a jury could reasonably conclude Santoro's action of driving in reverse to get away from Rowell was justifiable and thus concentrated heavily on, "Whatever excuse he's given for going backward, he's got no reasonable or rational explanation for why he went forward at all. Why is that? Because there isn't one."

The State argues Santoro's failure to appeal his criminal endangerment convictions establishes he committed negligent homicide. We do not agree. The elements of criminal endangerment are distinct and separate from those of negligent homicide. The criminal endangerment convictions are not before us for consideration in this appeal. Further, we do not speculate as to why Santoro only appealed the negligent homicide and limit our consideration only to the issues presented in this appeal.